**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| **BRANDON K. HOMMEL,** | ) | **CASE NO. 7:19CV00469** |
| | ) | |
| **Petitioner,** | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **JASON WILSON, Director, Virginia** | ) | **By: Hon. Glen E. Conrad** |
| **Center for Behavioral Rehabilitation,** | ) | **Senior United States District Judge** |
| | ) | |
| **Respondent.** | ) | |

Petitioner Brandon K. Hommel, proceeding pro se, filed this action as a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. He challenges the validity of his custody under an order from the Circuit Court of Roanoke County, Virginia, dated December 18, 2007, committing him civilly for treatment as a sexually violent predator (SVP) under the Sexually Violent Predator Act (the Act), Virginia Code Ann. §§ 37.2-900 — 921. The matter is presently before the court on respondent's motion to dismiss and Hommel's response thereto, making the matter ripe for disposition. For the reasons set forth below, the court concludes that respondent's motion to dismiss must be granted.

## I.  BACKGROUND

The factual and procedural background of this case arises from a series of related events resulting in criminal prosecutions in the Commonwealth of Virginia and in the United States District Court for the Northern District of Ohio, along with the Commonwealth's petition to have Hommel civilly committed as an SVP.

### A.  Factual Background

When Hommel was 18 years old, he met a 40-year-old man from Texas online, with whom he became involved emotionally and sexually. The man traveled to Ohio to see Hommel and paid

for Hommel to visit him in Texas.  This older man introduced Hommel to viewing child pornography and provided him several disks of videos and images to keep.  In addition to the disks from Texas, Hommel downloaded child pornography from the Internet for himself.  The two men also traveled to Roanoke County, Virginia, on occasion, to meet with another older man who had children, including an 8-year-old son and a 14-year-old son.  Some of the child pornography Hommel had previously viewed included both older men engaging in sexual activity with each other and with the minor sons.  (Tr. of Commitment Hr'g, Vol.2, Oct. 10, 2007, at 16 & 27.)

After returning to Ohio in late 2004, Hommel learned that his friend from Texas had been arrested on child pornography charges, and Hommel destroyed most of his own collection, but not all of it.  The arrest of his friend in Texas led to the arrest of the 8-year-old's father in Roanoke County.  When the boy was interviewed, he identified a photo of Hommel, stating that Hommel had performed oral sex on him two times in Roanoke on unknown dates between January and August of 2004.  Authorities arrested Hommel in Ohio in February 2005 on extradition warrants from Virginia for sodomy and aggravated sexual battery; law enforcement also searched his home and found the child pornography he had retained.  Id.

B.  Procedural History

1.  Criminal Cases

a.  Roanoke County Crimes

Pursuant to a written plea agreement, on October 13, 2005, Hommel pled "no contest" to one count of forcible sodomy in violation of Virginia Code Ann. § 18.2-67.1(A)(1) and one count of aggravated sexual battery in violation of Virginia Code Ann. § 18.2-67.3(A)(1).  The circuit court accepted the plea agreement and, according to its terms, sentenced Hommel to a total of ten

years in prison, with eight years suspended.   Commonwealth v. Hommel, No. CR05-0581 (Roanoke Co. Cir. Ct. R.).

       b.   Federal Pornography Charges

In September 2006, while Hommel was serving his active sentence in Virginia, a grand jury for the United States District Court for the Northern District of Ohio indicted him for four child pornography offenses occurring between August 2004 and February 2005.   After he had served his active sentence in Virginia—and after the civil hearing under Virginia's Sexually Violent Predator Act, discussed below—Hommel was transported to Ohio to face his federal charges.

Hommel entered a plea of guilty to all four federal charges.   The Ohio federal court sentenced him to serve four concurrent terms of 151 months, followed by lifetime supervised release. Judgment in a Criminal Case, United States v. Hommel, No. 1:06-CR-00458-LW (N.D. Ohio Nov. 4, 2008).

During his entire federal incarceration, Hommel did not incur a single disciplinary infraction.   He also completed therapeutic programming, including anger management, non-residential drug treatment, character development, stress and anxiety management, and recognizing and changing criminal thinking.   The Federal Bureau of Prisons (BOP) released Hommel to a halfway house in Ohio in February 2017.   There, Hommel was employed and attended weekly sex offender treatment in the community at Summit Psychological Associates. By all accounts, he was successful in abiding by all terms and conditions imposed upon him, and the termination report from Summit Psychological Associates, dated June 28, 2017, indicated that Hommel's prognosis for not re-offending was favorable.   However, in late June 2017, Hommel had to return to the BOP.   Specifically, the BOP interpreted the Virginia civil commitment order

as a detainer and required Hommel to return to prison until his BOP good-time release date of November 8, 2017.  Forensic Psychological Evaluation, dated Nov. 30, 2018, prepared by Mark Hastings, Ph.D., Commonwealth v. Hommel, No. CL06-1219-02 (Roanoke Co. Cir. Ct. R.).

2.  Civil Hearings Under Virginia's Sexually Violent Predator Act

a.  Initial Commitment Proceedings

On November 13, 2006, the Commonwealth filed a petition for civil commitment of Hommel as an SVP.  Hommel's scheduled release date from the Virginia criminal sentences was November 22, 2006.  Pursuant to Virginia Code Ann. § 37.2-906(A), however, the Roanoke County Circuit Court entered an order on November 13, 2006, directing that Hommel be held in the Virginia Department of Corrections (DOC) until entry of a final order in the civil commitment proceeding.[1]

i.  Preliminary Hearing

The Roanoke County Circuit Court held the required preliminary hearing on January 8, 2007, to determine if there was probable cause to believe that Hommel was an SVP within the meaning of the Act.  The Act defines a sexually violent predator as:

> [A]ny person who (i) has been convicted of a sexually violent offense . . . and (ii) because of a mental abnormality or personality disorder, finds it difficult to control his predatory behavior, which makes him likely to engage in sexually violent acts.

---

[1] Under the Act at that time, any person in custody for a sexually violent offense, as defined by the Act, would be assessed for possible civil commitment as an SVP. The Act required the Director of the DOC to maintain a database of all such persons in custody, and ten months before such an offender's release from prison, the Director determined the offender's risk of recidivism using the Static-99 or comparable risk assessment instrument.  The Director was to notify the Commitment Review Committee (CRC) of any inmate who scored 5 or higher (4 or higher if the victim was under age 13) on the Static-99.  The CRC had 180 days from such notification to conduct a full assessment, including an interview and comprehensive mental health evaluation of the inmate, to determine whether the inmate qualified as an SVP as defined in the Act and to make a recommendation to the Attorney General of Virginia regarding whether the inmate should be committed.  The Attorney General had an additional 90 days to review the recommendation of the CRC and either file a petition in the circuit court of the jurisdiction in which the prisoner was last convicted of a sexually violent offense or notify the Director of the DOC and Commissioner that such petition would not be filed. Va. Code Ann. §§ 37.2-903–905.

Va. Code Ann. § 37.2-900 (2007 Supp.).  This section of the Act further listed the offenses qualifying as sexually violent offenses, which then included both crimes of which Hommel was convicted in 2005.  Id.

In addition to introducing certified copies of the Roanoke County conviction and sentencing order for forcible sodomy and aggravated sexual battery, the Commonwealth offered the testimony of Dennis Carpenter, Psy.D., who had conducted a sex offender evaluation of Hommel in October 2006 on behalf of the CRC.  Based on Dr. Carpenter's review of Hommel's criminal record, his institutional record in the DOC, interviews with Hommel and Hommel's family members, and the results of numerous psychological tests administered over a seven to eight-hour period, Dr. Carpenter diagnosed Hommel with pedophilia, attraction to both male and female children, non-exclusive type (meaning that Hommel was attracted to adults as well as children).  He defined pedophilia as the presence of intense arousing fantasies or urges towards children, or acting on such fantasies, over a period of at least six months, after a person has reached age 15, plus engaging in sexual contact with a minor at least five years younger.  Although Hommel denied having committed the offenses, to which he had pleaded "no contest" on the advice of counsel, Dr. Carpenter assumed Hommel's guilt for diagnostic purposes, because Hommel was convicted of the offenses.  (Prelim. Hr'g Tr., Jan. 8, 2007, 14–18, 53, 77–79.)

Hommel identified himself as bisexual and verbalized interest in adult Caucasian males and females and adolescent females.  Hommel did not exhibit the distorted thinking typically demonstrated by people engaged in inappropriate sexual behavior.  On the Abel Assessment, the only test administered that could provide some objective measurement of sexual arousal in response to different categories of pictures, the assessment verified Hommel's arousal in response to the categories he admitted interest in,  but also demonstrated a high arousal response to young

males between the ages of eight and ten, the same age range as the victim of his crimes of conviction in Virginia.  (Id. at 43–47.)

Dr. Carpenter also diagnosed Hommel with dysthymic disorder (a pervasive, chronic mild depression), marijuana dependence in remission in a controlled environment, and personality disorder not otherwise specified (NOS) with passive-aggressive, avoidant, and self-defeating personality features.  Dr. Carpenter testified that Hommel's IQ was in the average range and that Hommel was not a psychopath.  Hommel had no prior criminal record or juvenile record and no history of antisocial criminality, but he had seen a mental health professional starting at age six because of anxiety.  Hommel also had difficulty controlling his anger during childhood and was medicated for depression from age thirteen to eighteen and again while in the DOC.  (Id. at 48–54.)

Dr. Carpenter testified about Hommel's scores on several widely accepted risk assessment measurements, including the Static-99, the Rapid Risk Assessment of Sexual Offender Recidivism (RRASOR), and the Sex Offender Risk Appraisal Guide.  Hommel scored a 4 on the Static-99, placing him in the medium-high risk category; offenders with that score had a 26% chance of re-offending (receiving a new conviction) within five years of release from prison, a 31% chance of a new conviction within ten years, and a 36% chance within fifteen years.  The RRASOR score of 3 predicted a 24-25% chance of re-offending within five years of release and a 36-37% chance within ten years.  Dr. Carpenter noted that the two most salient factors predicting recidivism for sex offenders are a paraphilia disorder (sexual deviance) and psychopathy.  Hommel's pedophilia is a paraphilia disorder (high risk), but Hommel is not a psychopath, so Hommel has one of the two salient factors.  Anxiety, depression, and substance abuse can increase the risk of sex offense

recidivism when a person has one of the primary salient factors risk factors.  (Id. at 21–25, 30–32, & 52–54.)

From the above information, Dr. Carpenter concluded that Hommel's personality disorder did not make him prone to sexually violent acts, but that his pedophilia was a mental abnormality that made him likely to commit sexually violent acts.  The Court found that Dr. Carpenter's conclusion and the data on which it was based supported a finding of probable cause and set the civil commitment petition for trial.  (Id. at 52.)

ii.  Pretrial and Trial Proceedings

Hommel's counsel filed several motions before the trial date, including an objection to jury trial, motion to change venue, and challenge to the constitutionality of the Act.  In particular, Hommel argued that the definition of SVP should be declared void for vagueness, as the Act did not define "predatory behavior" nor define the parameters of "likely" to engage in sexually violent acts.  All of these motions were overruled.  (Pretrial Mot. Hr'g Tr., June 18, 2007, 14 & 29.)

Virginia Code Ann. § 37.2-908 provides for a two-part trial for commitment of SVPs.  The first part is the determination, by clear and convincing evidence, that respondent is an SVP within the meaning of the Act.  Either the Commonwealth or respondent may request a trial by jury for this determination.  Va. Code Ann. § 37.2-908(B)-(C).  The Commonwealth had requested a trial by jury in June 2007, but during the week before Hommel's trial, withdrew that request.  Hommel objected to going forward with a jury once the state's jury trial request was withdrawn, but the Court chose to seat a jury over the objections of both parties, and seven jurors were selected.  (Trial Tr., Vol. 1, Oct. 10, 2007, 22.)

The Commonwealth introduced into evidence Hommel's conviction order from October 13, 2005; the Static-99 test result; Hommel's DOC record; Dr. Carpenter's Sexual Offender

7

Evaluation Report prepared October 20, 2006; and the evaluation report prepared May 21, 2007, by Dr. Doris Nevins, the expert appointed for Hommel. (Trial Tr., Vol. 2, Oct. 10, 2007, 4–11.) The Commonwealth also introduced the testimony of both Dr. Carpenter and Dr. Nevins. Dr. Carpenter's testimony covered the same material covered at Hommel's preliminary hearing in January 2007. (Id. at 12–77.) Dr. Nevins reviewed the same background information and performed many of the same or similar psychological tests. She also diagnosed Hommel with pedophilia, attracted to male and female, non-exclusive type, just as Dr. Carpenter had done. Rather than dysthymic disorder, she diagnosed depressive disorder NOS, a difference without much significance. She concurred with Dr. Carpenter's diagnosis of marijuana dependence in remission in a controlled environment. She also diagnosed personality disorder NOS but identified the traits as avoidant and paranoid. Most significantly, she agreed with Dr. Carpenter that Hommel qualified as an SVP because of his pedophilia diagnosis. She further agreed that Hommel was not psychopathic. She referred to Hommel's substance abuse and anger management issues as dynamic factors, capable of being changed, and stated her opinion that if successfully treated, those factors would not increase his risk of recidivism. (Id. at 79–89.)

Hommel offered no evidence at this phase of the trial. After closing arguments, the jury deliberated and ultimately returned a verdict finding Hommel to be an SVP.

The second phase of a trial under the Act, conducted by the Court alone, is the determination of whether to commit respondent to the Department of Mental Health, Mental Retardation, and Substance Abuse Services (DMHMRSAS) or to grant conditional release, subject to strict terms and conditions. As provided for in Virginia Code Ann. § 37.2-908(D) and (E), the Court decided to hear additional evidence on possible alternatives to full commitment and directed the Commissioner of DMHMRSAS to prepare a report for the Court regarding suitable alternatives

to commitment.  The Court then scheduled the hearing for the final commitment determination thirty to sixty days later.

Immediately before the final commitment determination hearing on November 14, 2007, the Court heard argument from the parties on Hommel's motion to compel specific performance of the plea agreement.  Hommel argued that the plea agreement reflected the full penalty agreed to for his plea of no contest to the criminal charges; he had served his prison time (plus an additional year by then) and was supposed to have five years of supervision, including treatment in the community.  He argued that the state was trying to circumvent the agreement by seeking civil commitment.  The Court disagreed, finding the civil commitment proceeding to be entirely separate from the criminal prosecution, and that the Commonwealth had fulfilled its obligations under the plea agreement.  (Disp. Hr'g Tr., Nov. 14, 2007, 8–41.)

The first witness at the disposition hearing was Stephen Wolfe, Ph.D., Director of the Office of SVP Services at DMHMRSAS.  Dr. Wolfe identified and explained the proposed conditional release plan prepared by Carolyn Harrington, an SVP specialist in his office who was unavailable to attend court that day.  Wolfe explained that conditional release plans are designed to protect the public while giving the offender the maximum opportunity to succeed in the community.  Once a plan is prepared, the plan is sent to the DOC/local probation office to see if the resources are available to support the plan.  The plan for Hommel was designed to address several specific concerns, including Hommel's: (1) denial and dishonesty about the extent of his problem; (2) pattern of sexual attraction to prepubescent males; (3) long history of substance abuse; (4) history of child pornography exposure; (5) sexual and emotional relationship with a man involved in the production and distribution of child pornography; and (6) lack of family or other

support system in Virginia.  Wolfe testified that Hommel would be suitable for conditional release only if the plan could be followed in every respect.  (Id. at 47–61.)

Randy Phillips, Senior Probation Officer, testified that he had reviewed the conditional release plan and had concluded that not all resources required to implement the plan were available.  First, the plan required an informed adult chaperone to live in the home with Hommel.  Because Hommel had no family or suitable friends in Virginia, there was no one who could live with Hommel and be relied upon to report any non-compliance.  Even if Hommel's family lived in the area, Phillips noted that the family believed Hommel to be innocent of the charges, so they would not be suitable in-home monitors.  Next, the DMHMRSAS plan required Hommel to maintain employment that had no contact whatsoever with minors; Phillips opined that such employment would be virtually impossible to find, because the area relied heavily on retail businesses, and there is always a risk that a minor will appear at a cash register to make a purchase.  Probation would modify the plan by using GPS monitoring in lieu of a live-in chaperone; however, Hommel had nowhere to live in Roanoke, and of places available for newly released offenders, only the Rescue Mission would take Hommel.  The Rescue Mission did not have the means to support GPS monitoring.  For employment, probation would modify the plan to prohibit employment that contemplated frequent or regular contact with minors, but occasional incidental contact would not be a violation.  If an offender is motivated and honest, Phillips believed such modifications to the plan were workable.  Based on DMHMRSAS concerns, however, he could not say that the modified plan would work for Hommel.  (Id. at 68–90.)

The Commonwealth then re-called Dr. Wolfe.  Wolfe opined that probation's suggested modifications to the plan would reduce public safety.  GPS monitoring tells probation where a person is, but not who he is with or what he is doing.  A live-in monitor/chaperone was essential

to the plan for Hommel.  Wolfe would recommend full commitment rather than conditional release if the plan were modified as suggested by probation.  (Id. at 130–34.)  Dr. Carpenter also testified that Hommel would pose a significant risk in the community and that he needed intensive in-patient treatment before he could be released safely.   In his opinion, the Virginia Center for Behavioral Rehabilitation was the only facility in Virginia providing the 24/7 treatment that Hommel needed.  Dr. Carpenter was not aware of residential treatment facilities available in Ohio; if such a facility existed and offered the same intensive treatment, Carpenter would not object to Hommel receiving treatment there.  (Id. at 100–118.)

After the Commonwealth rested its case, Hommel's father testified on Hommel's behalf. His father testified that any one of several family members would be available to live with Hommel and provide emotional support to him, if the Court would allow him to return to Ohio to live.  He promised to notify the Court if Hommel violated any terms of his release.  When asked whether he believed Hommel committed the offenses of sodomy and aggravated sexual battery, he said he did not deny that Hommel had committed the crime; he just found it hard to believe, given his knowledge of his son.  (Id. at 141–44.)

Finally, Dr. Doris Nevins, the defense appointed expert, testified that she believed Hommel could succeed on the release plan as modified by probation.  She believed Hommel would benefit more from substance abuse treatment and sex offender treatment in the community, while he was reintegrating with society and being monitored.  While she agreed that some sex offender treatment before release would be ideal, she also noted that Hommel would be 25 years old in two weeks, at which time his Static-99 score would drop from 4 to 3.  Had he scored 3 previously, his case would never have been eligible for referral to the Attorney General's Office to consider for civil commitment.  Further, because he still had federal charges to face before he could be committed

or released, everything that current opinions were based upon would be moot and possibly irrelevant by the time he served a federal sentence. (Id. at 147–157.)

Following the hearing, the Court ruled that no suitable alternative to full commitment existed. As requested by the Commonwealth, the Court entered an order, dated December 18, 2007, committing Hommel to the Commissioner of DMHMRSAS, but staying that commitment until completion of Hommel's federal case in Ohio and service of any prison term imposed in that case. The Court directed the DOC to release Hommel to the custody of the U.S. Marshals Service (USMS). Upon conclusion of his federal sentence, the Court directed, the USMS would return Hommel to Virginia DOC custody for transfer to the Commissioner to begin his civil commitment, with his first SVP annual review of commitment under Virginia Code Ann. § 37.2-910 to be conducted one year thereafter.

      iii.  Appeal

Hommel appealed the commitment order to the Supreme Court of Virginia, raising several issues, including the constitutional vagueness argument regarding the meaning of "predatory behavior" and "likely" to engage in such behavior, and the circuit court's failure to enforce the terms of the plea agreement. By order dated September 25, 2008, the Supreme Court of Virginia denied the appeal. Hommel v. Commonwealth, No. 080521 (Va. S. Ct. Sept. 25, 2008).

      b.  2017 Challenge to Commitment Order

Nine years later, as Hommel neared completion of his federal sentence, counsel filed a motion to dismiss the commitment case and a motion to enjoin enforcement of the commitment order entered November 14, 2007. The October 2017 motions alleged that the Roanoke County court had no statutory authority in 2007 to stay the civil commitment nor to compel Hommel's involuntary return to Virginia ten years later. Hommel also argued that Virginia no longer had

subject matter jurisdiction over him once he left the custody of the DOC without being placed in the custody of DMHMRSAS.

Hommel further noted that no re-evaluation had been done in the ten years since the commitment order was entered, contrary to Virginia Code Ann. § 37.2-910. Although Code § 37.2-919 allows tolling of the annual review if a person is arrested, convicted, and incarcerated on a new offense after the commitment determination, no such provision allows tolling of the annual review if an inmate still has to serve time on an offense that occurred before the commitment proceeding. Hommel contended that because no annual reviews had occurred and ten years had elapsed, the Commonwealth had failed to comply with the statutory scheme and could not prove that Hommel remained an SVP within the meaning of the Act.

In opposition to Hommel's motions, the Commonwealth argued that (1) Hommel's objection to the order staying his commitment was untimely, (2) the Roanoke County court had inherent authority to stay execution of its order, (3) the Court had no authority to prevent the federal court from asserting jurisdiction on federal criminal charges once the state criminal sentence had been served, and (4) the Court never lost subject matter jurisdiction over Hommel by staying the commitment, because the Court had jurisdiction when the commitment petition was filed and specifically retained jurisdiction in the order staying the commitment. Following a hearing, the Court denied both motions by written orders dated November 16, 2017. Hommel was released from the BOP on November 8, 2017 and transferred to the custody of the Department of Behavioral Health and Developmental Services (formerly the DMHMRSAS) to start his inpatient treatment.

Hommel appealed the Court's denial of his motion to dismiss for lack of subject matter jurisdiction. The Supreme Court of Virginia denied the petition on July 24, 2018. That alleged jurisdictional issue is the subject of the current § 2254 petition.

c. <u>Subsequent Hearings</u>

i. <u>First Annual Review Hearing</u>

Hommel's first annual re-evaluation hearing was held on December 19, 2018.  Dr. Mario Dennis, Virginia Center for Behavior Rehabilitation (VCBR) Clinical Psychologist and Director of Forensic Services, testified for the Commonwealth, consistently with a report he prepared October 23, 2018, recommending continued in-patient treatment for Hommel at VCBR.  Dr. Dennis testified that Hommel was in phase two of the three-phase treatment program and that Hommel's attendance and participation were excellent.  Hommel had completed twelve weeks of prior outpatient therapy in Ohio, for which he was given credit by VCBR, and Hommel had done well in the community without reoffending from February through June 2017, while he was in the halfway house in Ohio.  Hommel was honest about his prior offenses, no longer denying his culpability, and seemed sincerely motivated to live a law-abiding life in the future.  He had come to terms with his sexual identity, considering himself gay.  Dr. Dennis diagnosed Hommel with pedophilia, male only, non-exclusive, hebephilia (attraction to adolescents aged 12 to 14), and mild cannabis use disorder, controlled environment.  Hommel no longer demonstrated sufficient maladaptive personality traits for a diagnosis of personality disorder.  (Annual Hr'g Tr., Dec. 9, 2018, 5–15; Report of Dr. Mario Dennis dated Oct. 23, 2018.)

Despite these positive developments, Dr. Dennis felt continued commitment was necessary because: Hommel was "resistant" to taking a full disclosure polygraph test, Hommel believed that he was no longer sexually attracted to children, and Hommel had not yet started phase 3 of the program.  Dr. Dennis believed that all participants should finish phase 2 and complete at least one or two quarters of phase 3 before being considered for conditional release.  In terms of treatment modules, Hommel still needed to complete three out of seven relapse-prevention modules and a

therapeutic module on arousal management.  Tracking the factors listed in Virginia Code Ann. § 37.2-912(A), Dr. Dennis opined that Hommel remained in need of inpatient treatment, that outpatient treatment and supervision would be inadequate, that he "would have more confidence" in Hommel's compliance with terms of release if he completed inpatient treatment first, and that premature conditional release could put the community at risk.  (Annual Hr'g Tr., 15–37.)

Dr. Mark Hastings testified as the defense expert.  Based on his review of the treatment records and his interview with Hommel, Dr. Hastings opined that Hommel could safely complete his remaining treatment in the community rather than in an in-patient setting, and he recommended that the Court consider setting terms of conditional release.  In support of his recommendation, Dr. Hastings made several observations.  First, he considered the SVP classification for Hommel to be weak, because his two incidents were with a single person barely over six months apart, and his possession of child pornography was non-violent; further, all of his offending conduct was related to his involvement with a parasitic older man when Hommel had just entered adulthood.  Dr. Hastings also disagreed with the separate diagnosis of hebephilia, which is arguably covered by the pedophilia diagnosis.[2]  Further, everything in Hommel's history involved younger males, from the 8-year-old boy he molested to his pornography collection, primarily depicting children under age 13, and Abel testing revealing arousal in response to males between 8 and 10 years old.  Next, Dr. Hastings felt that Hommel had demonstrated his amenability to supervision on conditional release during his halfway house placement in Ohio, where he behaved well and fully complied with his treatment obligations.  Furthermore, Hommel will be on federal supervision for the rest of his life.  Dr. Hastings added that Hommel had continued to make significant gains in treatment

---

[2]  The American Psychiatric Association does not recognize a diagnosis of hebephilia, which is not included in the American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).

at VCBR, could identify his internal and external triggers, and had grown a lot during the fourteen years since his offense.  Dr. Hastings clarified on cross-examination that he was not saying that Hommel did not need treatment, only that he did not need to remain committed as an inpatient to successfully complete the program.

Following the evidentiary hearing, by order dated January 2, 2019, the Court re-committed Hommel to VCBR.  Hommel timely appealed that decision.  The Supreme Court of Virginia denied that appeal on October 23, 2019.

    ii. <u>Second Annual Review Hearing</u>

According to the Notice of Conditional Release and attached state court Order, filed by the respondent in this case, the Roanoke County Circuit Court found Hommel suitable for Conditional Release after the second annual review hearing, held December 18, 2019.  The parties developed a Proposed Conditional Release Plan dated February 6, 2020, and revised March 10, 2020, which the Court approved and ordered Hommel to comply with by order dated March 27, 2020.  The plan incorporated into the order requires GPS supervision of Hommel; residence at a pre-approved address in Newport News, Virginia; weekly meetings with his probation officer for at least the first six months, then gradually decreased to no less than once per month; continued outpatient sex offender treatment and recommended assessments (including penile plethysmograph testing); substance abuse evaluation followed by any recommended treatment; random drug testing; polygraph examinations every six months, with questions determined by both the treatment provider and probation officer; no contact with minors without prior approval of the supervising officer; maintenance of a log of incidental contact with minors; no contact with his victim; and other terms and conditions.

C.  Petitioner's § 2254 Claim

Hommel's sole habeas corpus claim herein is that the Roanoke County Circuit Court had no jurisdiction to require his transfer to VCBR in 2017 and that accordingly, the order denying his motion to dismiss the commitment for lack of jurisdiction was an unconstitutional exercise of authority.

II.  DISCUSSION

A.  Procedural Requirements

1.  Custody

A federal district court has habeas jurisdiction over claims "of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  A litigant can meet the custody requirement not only when he is in prison pursuant to a criminal conviction, but also if he has been civilly committed pursuant to a state court order.  Duncan v. Walker, 533 U.S. 167, 176 (2001).  At the time Hommel filed his petition herein, he was in custody at VCBR, pursuant to an order of the Roanoke County Circuit Court.

Nor is custody limited to "actual physical custody."  Jones v. Cunningham, 371 U.S. 236, 239 (1963).  A person is "in custody" if subject to significant restraints on liberty that are not otherwise experienced by the general public, so long as the restraints are a direct consequence of the challenged state order.  Id. at 240.  Although Hommel has been conditionally released from his commitment to VCBR, the conditions of his release, as outlined in the prior subsection, are onerous.  He must meet with his probation officer weekly, register as a sex offender, and live at the approved address in Virginia.  His location is monitored around the clock by GPS.  These conditions constitute a significant restraint on his liberty, and a failure to abide by any condition

17

could result in his recommitment to VCBR.  Thus, for <u>habeas</u> purposes, Hommel remains "in custody."  <u>See</u> <u>Piasecki v. Court of Common Pleas, Bucks Co., Pa.</u>, 917 F.3d 161 (2019).

    2.  <u>Timeliness</u>

As amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), federal statutes also require state prisoners to meet additional procedural requirements before a federal court may grant relief in habeas corpus.  First, the petitioner must timely file his claim, generally within one year from the date on which the state court judgment became final.  28 U.S.C. 2244(d)(1)(A).  Respondent herein asserts that Hommel's petition is untimely, because respondent perceives Hommel's attack to be against the 2007 commitment order.  To the extent that part of Hommel's claim were read as a challenge to the 2007 order, this petition would be untimely.

However, Hommel's petition specifically attacks the state order entered November 16, 2017. (Pet. 1, ECF No. 4; Am. Pet. 1, ECF No. 9.)  He makes no claim that the court lacked subject matter jurisdiction in 2007, only that the jurisdiction no longer existed in 2017, after he had been incarcerated in Ohio for ten years.  Accordingly, the court construes his petition as attacking the order of November 16, 2017, denying his motion to dismiss on the grounds that the Roanoke County Circuit Court no longer had jurisdiction over him and no authority to order his involuntary return to Virginia.  As recognized by the Seventh Circuit Court of Appeals, "[E]ach state court order continuing [petitioner's] commitment or denying his challenge to such commitment constitutes a new judgment for purposes of the AEDPA, and therefore starts a new statute of limitations period."  <u>Martin v. Bartow</u>, 628 F.3d 871, 874 (7th Cir. 2010).

Respondent argues that Hommel could have raised his current habeas corpus claims earlier.  Specifically, at the time the first commitment order was entered in 2007, Hommel could have objected to the circuit court's staying of his commitment and to the circuit court's authority to

require his return to Virginia after completion of his federal sentence. Respondent contends that because Hommel failed to do so, the claim is untimely and was also procedurally defaulted in state court. The court finds no merit to this argument. At the time of his 2007 commitment hearing, Hommel did not know that he would be in federal prison in Ohio for ten years, because that case had not yet been prosecuted and he had not yet consulted with a federal attorney about those charges. He did not know that he would be released from BOP custody into a halfway house in Ohio, where he worked and successfully attended community treatment, and then would, nevertheless, be reincarcerated in Ohio and Virginia, based on a ten-year-old civil commitment detainer from Virginia. This issue of the circuit court's continuing jurisdiction after so many years was highly relevant to Hommel's 2017 motion to dismiss the case and enjoin enforcement of the 2007 order, even though it was also relevant to the original order in 2007. As the Seventh Circuit Court of Appeals noted in Martin, unlike a conviction and sentence for a singular criminal offense, a person's current status as an SVP is continually subject to re-challenge, as a matter of constitutional law. Id. at 877.

The Martin court analogized the situation to Magwood v. Patterson, 561 U.S. 320 (2010). In Magwood, the petitioner successfully challenged his death sentence on habeas review and received a new sentencing hearing. At the re-sentencing hearing, where he again received the death penalty, Magwood's attorney failed to raise an error; the same error had been made during the first sentencing hearing but was not raised as an error during his first habeas challenge, which had succeeded on different grounds. The government argued that Magwood could not raise that objection in his habeas attack on the second death sentence, because it would be, in effect, raising a second and successive attack on the first sentence. The Supreme Court disagreed, stating "An error made a second time is still a new error" when occurring in a new hearing. 561 U.S. at 339.

Likewise, here, Hommel did not object to the circuit court's future jurisdiction in the 2007 commitment proceeding and appeal, and the court did not address subject matter jurisdiction then. Hommel raised the issue in 2017, and the circuit court denied his motion.  Although the 2017 order was brief, with little reasoning to explain its decision, it was clearly a decision on the merits, finding that the circuit court had not lost jurisdiction and denying the motion to dismiss for lack of subject matter jurisdiction.  That is the decision Hommel challenges in this § 2254 petition, and the decision was documented only in the 2017 order.

Hommel appealed the order of November 16, 2017, to the Supreme Court of Virginia, which denied the appeal on July 24, 2018.  He did not petition the United States Supreme Court for certiorari, and the time in which to do so expired 90 days thereafter, on October 22, 2018.  The federal one-year limitation period under 28 U.S.C. § 2244(d)(1)(A) began to run on that date; the § 2254 petition, filed June 24, 2019, was well within the one year and is timely.

3.  Exhaustion and Procedural Default

The final procedural hurdle is that Hommel must have exhausted his state court remedies before filing in federal court.  28 U.S.C. § 2254(b)(1)(A).  The exhaustion requirement means that a petitioner must fairly present the substance of his federal constitutional claim to the highest state court and give that court the opportunity to apply controlling legal principles to the facts relevant to his claim.  Anderson v. Harless, 459 U.S. 4, 6 (1982).  Respondent acknowledges that Hommel presented his claim to the Supreme Court of Virginia by appealing the circuit court's order of November 16, 2017.  However, respondent claims that the jurisdiction issue raised in that appeal was untimely and, therefore, was procedurally defaulted.  As discussed in the prior subsection, this contention is based upon respondent's efforts to cast Hommel's claim as a challenge to the 2007 order, rather than as an attack on the 2017 order.

20

Even when a petitioner has exhausted his claims by presenting them to the state's highest court, if the state court expressly bases its dismissal of a claim on the petitioner's violation of a state procedural rule, including timeliness, then that procedural rule may provide an independent and adequate ground for dismissal of the claim; where such an independent and adequate state ground for dismissal is present, the federal <u>habeas</u> claim is also procedurally barred.  <u>Breard v. Pruett</u>, 134 F.3d 615, 619 (4th Cir. 1998).  If the last reasoned state court opinion did not clearly and expressly rely on an independent and adequate state ground, a federal court may address the merits of the claim.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 735 (1991).  In other words, the court presumes that the state's decision was rendered on the merits.  <u>Harrington v. Richter</u>, 562 U.S. 86, 99 (2011).  In the present case, the Supreme Court of Virginia issued a summary decision refusing the appeal, saying only "[T]he Court is of opinion there is no reversible error in the judgment complained of."  Order, <u>Hommel v. Commonwealth</u>, No. 180220 (Va. S. Ct. July 24, 2018).  Accordingly, this court must "look through" to the prior opinion to determine if the state court decided the case on procedural default grounds.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

The circuit court order of November 16, 2017—the only other state court order on the issue—stated, in relevant part, as follows:

> . . . the Court hereby FINDS that this Court has not lost jurisdiction over the case and that staying the Respondent's civil commitment was an appropriate exercise of this Court's authority.  For those reasons, and for all of the reasons stated on the record, it is hereby ADJUDGED, ORDERED and DECREED that:
>
> 1. the Respondent's Motion to Dismiss this case for lack of jurisdiction is hereby DENIED; and
>
> 2. the Respondent's Motion to Dismiss this case for the Commonwealth's alleged failure to abide by the statutory scheme is hereby DENIED;

3. the Respondent's Motion to Dismiss this case for lack of the Respondent having an annual review hearing pursuant to Virginia Code Ann. § 37.2-910 is hereby DENIED; and

4. the December 18, 2007 Order therefore remains in full force and effect; and

5. pursuant to the December 18, 2007 Order, upon the Respondent's completion of his confinement from his federal convictions, the Respondent shall be returned to the custody of the Commissioner to begin his civil commitment.

Because this Order did not clearly and expressly rely on a procedural default ground, such as timeliness, there is no procedural bar to this court's consideration of Hommel's habeas claim.

## B.  Merits of Claim

Where a state court's decision does not explain its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's ruling.  Harrington, 562 U.S. at 98. This is because 28 U.S.C. § 2254(d) requires a federal habeas court to give great deference to state court determinations of fact and conclusions of law.  A federal court may grant relief on a claim considered by the state court only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

The civil commitment of a prisoner for treatment when he would otherwise be released from prison, having served his sentence, is a deprivation of liberty that must be accompanied by appropriate procedural protections in order to comply with the Due Process Clause.  Foucha v. Louisiana, 504 U.S. 71, 79 (1992); Vitek v. Jones, 445 U.S. 480, 492 (1980).  The Supreme Court has held that indefinite confinement for mental illness alone is unconstitutional, as is indefinite

confinement for dangerousness alone; a person "may be held as long as he is both mentally ill and dangerous, but no longer." Foucha, 504 U.S. at 77. Further, "the nature of the commitment must bear some reasonable relation to the purpose for which the individual is committed." Id. at 79. The state seeking to deprive a citizen of his liberty via a civil commitment proceeding must prove the qualifying criteria at least by clear and convincing evidence. Id. at 80. Finally, due process substantively prohibits "arbitrary, wrongful government actions" no matter how fair the procedures might be. Id.

In Kansas v. Hendricks, 521 U.S. 346 (1997), the Supreme Court applied the above criteria to the Kansas Sexually Violent Predator Act, Kan. Stat. Ann. §§ 59-29a01 to 29a27, which operates very similarly to Virginia's Act. The Kansas statute defined an SVP as:

> any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.

Kan. Stat. Ann. § 59-29a02 (1994). Hendricks challenged the Kansas statutory scheme as a violation of due process because it required only proof of a mental abnormality or personality disorder, rather than a mental illness. In upholding the statute, the Supreme Court found the difference between mental abnormality and mental illness to be a difference without significance, noting that even psychiatrists often disagree about what constitutes mental illness. Hendricks, 521 U.S. at 359. The Court also noted that involuntary commitment statutes have been consistently upheld as long as "confinement takes place pursuant to proper procedures and evidentiary standards." Id. at 357 (citations omitted). The procedure for judicial review after every year held in commitment ensures that an individual has the opportunity for release when no longer dangerous or mentally ill. Id. at 364. Given the similarity between the Kansas Act and Virginia's Act, the Roanoke County court's implicit determination in its Order of November 16, 2017—that

Hommel's commitment as an SVP pursuant to the Act did not violate federal constitutional principles—cannot be considered unreasonable under § 2254(d).

Hommel has not explained how his subject-matter jurisdictional argument rises to the level of a federal constitutional claim. "Subject matter jurisdiction refers to a court's power to adjudicate a class of cases or controversies, and this power must be granted through a constitution or statute." Jenkins v. Director of Virginia Center for Behavioral Rehabilitation, 624 S.E.2d 453, 458 (Va. 2006). The Virginia Code confers subject matter jurisdiction on the circuit courts. The court's authority to commit or conditionally release an SVP "is wholly derived from and limited by" the Act. Commonwealth v. Amerson, 706 S.E.2d 879, 883 (Va. 2011). Interpretation of that Act is a matter of state law. The Roanoke County Circuit Court held that it retained jurisdiction under the Act and that it acted within its authority by staying the commitment and retaining jurisdiction. In denying Hommel's appeal, finding no error in the order appealed from, the Supreme Court of Virginia agreed. It is not the province of a federal habeas court to examine state-law questions of statutory interpretation. Estelle v. McGuire, 502 U.S. 62, 68 (1991); see also 28 U.S.C. § 2254(e)(1) (presuming state court factual findings correct, absent rebuttal by clear and convincing evidence)

The Seventh Circuit Court of Appeals addressed a similar situation in Gilbert v. McCulloch, 776 F.3d 487 (7th Cir. 2015). Gilbert had a pending civil commitment hearing as an SVP. Before the commitment trial was held, Gilbert violated his parole and was revoked; he was serving his violation prison sentence when the commitment hearing was held. The jury found him to be an SVP, and the court entered an order committing him for treatment. He was not transferred to the treatment facility until two and a half years later, however, when he finished serving his term of incarceration. Shortly before his release from prison, Gilbert filed a motion to dismiss the

commitment proceedings, arguing that the court no longer had jurisdiction once he was transferred to prison instead of the treatment facility.  The state court concluded that Gilbert's argument centered on statutory interpretation of the Wisconsin act, and that his constitutional arguments were not well-developed.  Nevertheless, after rejecting Gilbert's interpretation of the act, the Wisconsin Supreme Court also addressed the constitutional issues, finding that Gilbert's due process rights were protected by the court hearing finding him to be both mentally ill and dangerous at the time the commitment hearing was held.  His right to be held only so long as he was both mentally ill and dangerous was protected by the process for periodic re-evaluation (available only after he started treatment in the commitment program) to determine whether he remained an SVP.  In denying Gilbert's federal <u>habeas</u> claim, the Seventh Circuit Court of Appeals stated:

> Were the question presented to us an initial question of federal constitutional law, we might reach a different result.  The two-and-a-half year [sic] delay between the order of commitment and Gilbert's entry into DHS care is certainly a concern for us.  We are constrained, though, by the posture of this case and by the narrow scope of our habeas [sic] review.  The Wisconsin Supreme Court concluded that its statutory scheme allowed the simultaneous commitment and incarceration of a sexually violent person, and that <u>Foucha</u> did not preclude such an interpretation.

<u>Id.</u> at 495.

Likewise, Hommel's argument herein focuses on interpretation of the jurisdiction conferred by Virginia's Act.  Hommel's constitutional arguments were not well-developed in circuit court and are not developed at all before this court.  This court could simply dismiss Hommel's petition because state law interpretation issues are not a proper subject for federal <u>habeas</u> review and because the federal constitutional issues were not fairly presented for resolution. <u>Id.</u>; <u>Estelle</u>, 502 U.S. at 68.

Even if Hommel had fully articulated the due process issues raised by the ten-year delay between entry of the commitment order and Hommel's actual entry into treatment at VCBR, this court still would be required to dismiss this claim.  A federal <u>habeas</u> court is limited to deciding whether a decision on a federal constitutional issue is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement."  <u>Harrington</u>, 562 U.S. at 102-03.  The standard is difficult to meet because it was meant to be.  Federal intrusion into state court matters tramples state sovereignty, and the AEDPA purposefully limited federal authority to interfere in state judgments only to those extreme situations in which no one could disagree that a state court's action was completely lacking in justification.  <u>Id.</u>  The federal court need not believe that the state court's decision is appropriate, sound policy, or even correct; the court must uphold the state decision unless it is directly contrary to Supreme Court precedent or is a completely unreasonable application of Court precedent.  The Seventh Circuit Court of Appeals in <u>Gilbert</u> could not say that the Wisconsin court's interpretation of <u>Foucha</u> and <u>Hendricks</u> was an unreasonable application of federal law.  Likewise, this court cannot say that no reasonable jurist would agree with the decisions of the Virginia courts in Hommel's case.  Therefore, the court will dismiss Hommel's claim, pursuant to § 2254(d).

### III. Conclusion

After careful review of the petition, the motion to dismiss, and pertinent parts of the state court records and decisions, the court concludes that the respondent's motion to dismiss must be granted.  An appropriate order will issue this day.

**ENTER:**  This ___9th___ day of July, 2020.

_____
Senior United States District Judge